UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MECHELLE A. TUCKER,

    Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY,

    Defendant.

_____/

CASE No. 1:17-cv-267

HON. ROBERT J. JONKER

## OPINION AND ORDER

This is a civil action for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The matter before the Court is on Defendant Pennsylvania Higher Education Assistance Agency's ("PHEAA") Motion for Summary Judgment (ECF No. 30), and Plaintiff Mechelle Tucker's Corrected Motion for Summary Judgment. (ECF No. 33). Tucker's Complaint alleges PHEAA violated the TCPA by making several unwanted phone calls to her cell phone, even after she asked PHEAA to stop calling her. PHEAA argues Plaintiff cannot succeed with this action because even if Plaintiff's facts are correct, the TCPA includes a statutory exemption for calls made solely for the purpose of collecting debts guaranteed by the United States. All the calls at issue here were for such a purpose.

The Court heard argument on the motions on April 12, 2018, and thereafter took the matter under advisement. The Court then invited and received additional briefing from the parties. Based on all matters of record, and for the reasons detailed below, Tucker's motion is denied, PHEAA's motion is granted, and this matter is dismissed. In short, Congress changed the rule, effective

November 2, 2015, and exempted calls to collect debts guaranteed by the United States from the TCPA. All the calls at issue here were after the statutory change and addressed debts guaranteed by the United States.

## BACKGROUND

Defendant PHEAA is a quasi-governmental agency of the Commonwealth of Pennsylvania. It is engaged in the business of managing student aid. (Krobath Decl. ¶4, ECF No. 31-1, PageID.161). As part of this work, it serves as a student loan guarantor for the United States Federal Family Education Loan Program ("FFEL"). (*Id.* at ¶ 6). FFEL is a government program that permits private lenders to issue loans to borrowers. These loans are ultimately guaranteed by the United States. (*Id.* at ¶ 7). PHEAA services its federal student loans through one of its divisions, American Education Services ("AES"). (*Id.* at ¶5). This case concerns Plaintiff Tucker's FFEL loans that were serviced and guaranteed by AES and PHEAA.

**1. Tucker Takes Out Loans, Enters Repayment, and Consolidates: 1996-2010**

The events in this case stem from certain student loans that Tucker appears to have taken out beginning in 1996. While PHEAA's briefs lay out a history of those loans, Tucker's briefs largely bypass any discussion of these events and focus instead on the time period beginning in January 2016, when she avers PHEAA began to call her cell phone in violation of the TCPA.

PHEAA avers that in 1996 Tucker applied for, and received, two loans under the FFEL program totaling approximately $20,681. (ECF No. 31, PageID.144). The loans were taken out by Tucker so that she could attend classes at ITT Technical Institute and the University of Phoenix.[1] Tucker did not make any payments on these loans between 1996 and 2006 because she

---

[1] During Tucker's deposition, PHEAA asked her whether she recalled receiving loans in the amounts that were listed on an application for a loan consolidation. (ECF No. 31-3). Tucker

2

was either in school or in some other type of forbearance. (Krobath Decl. ¶ 10).[2]  Then, on October 25, 2006, Tucker consolidated her two loans, which had variable interest rates, into a single loan with a fixed interest rate by completing a FFEL Program Federal Consolidation Loan Application with a new promissory note. (*Id.* at ¶ 11).  The consolidated loan appears to have been serviced by AES.

Tucker's payment history on the consolidated loan during this period is not clear.  While it appears she made few (if any) payments, she was able to avoid default, at least for a time, by entering into forbearance agreements.  More specifically, PHEAA contends Tucker submitted multiple deferment and forbearance requests throughout the 2007-2010 period.  Two of those requests were a January 2007 Unemployment Deferent Request and a November 2007 Economic Hardship Deferment Request, (*id.* at ¶¶ 14-15) though again, Tucker testified she did not recall having made those requests or whether she in fact received forbearances. (Tucker Dep. 31, ECF No. 31-2).

**2.  Tucker Defaults on Her Consolidated Loan: 2010-2015**

According to PHEAA, Tucker ended up defaulting on her FFEL consolidated loan on August 13, 2010.  (Krobath Decl. at ¶ 16, ECF No. 31-1).  The following spring, on February 28, 2011, Tucker called PHEAA from a number that appears to be connected to her cell phone, ending in -9895, to discuss her loans.  (*Id.* at ¶ 17).  PHEAA also contends that during this call Tucker consented to receive autodialed calls from PHEAA (*id.*), and a business record provided by

---

testified she did not recall receiving loans in those amounts, but she did not deny receiving loans in those amounts either. (Tucker Dep. 8:6-9:1, ECF No. 31-2, PageID.171-172).

[2] The exact dates when Tucker was enrolled either in ITT Tech or the University of Phoenix are not clear from this record beyond the fact that she appears to have attended sometime between 1996 and 2006.

3

PHEAA states that Tucker "GV CNSNT TO BE CLLD AT PRI PH VIA AUTODLR." (ECF No. 31-9, PageID.213).

The call does not appear to have helped Tucker get out of default, and on August 6, 2011, Tucker received a letter from AES stating that "[t]he U.S. Department of Education (ED) holds a claim against you for . . . defaulted student loan(s)." (ECF No. 31-5, PageID.207). Tucker now owed a total of $28,874.11, and was encouraged to contact AES to pay her debt. (*Id.*). Tucker does not recall receiving the document. (Tucker Dep. 33:13-34:10, ECF No. 31-2).

The next event in the record is an April 4, 2013, communication to AES from the law firm Lawrence Wilson & Associates. Attorney Wilson's letter indicated that the firm represented Tucker, and he asked for a copy of AES's file on Tucker. (ECF No. 31-6, PageID.208). Mr. Wilson's letter to AES stated that it appeared Tucker's debt was listed twice on Tucker's credit report. (*Id.*). Tucker testified that she had been receiving correspondence from AES that she did not understand, and she thought a lawyer would be able to explain things to her and assist her with her default. (Tucker Dep. 37, ECF No. 31-2). AES responded to Mr. Wilson on April 30, 2013. (ECF No. 31-7, PageID.209-211). It noted that Tucker's loans had been administered by AES since the disbursement in November 2006. The consolidated loan had then defaulted to PHEAA, as the guarantor, on August 13, 2010. (*Id.*). There is no further action related to this inquiry in the record.

### 3. Tucker Rehabilitates Her Defaulted Loan: 2015-2016

More than two years later, on May 1, 2015, Tucker signed a Defaulted Student Loan Rehabilitation Agreement with PHEAA. (ECF No. 31-8, PageID.212). The agreement allowed Tucker to make 9 payments of $5.00 a month in order to rehabilitate her defaulted consolidated loan. Once those payments were made, the loan would no longer be in default and the notation of

default on Tucker's credit report would be removed.  (Krobath Decl. ¶ 21-22, ECF No. 31-1).  The rehabilitation agreement stated that Tucker agreed to allow PHEAA Default Collections to rehabilitate her loan, and that the new loan balance would include accrued interest, outstanding charges, and costs that would not exceed 16 percent.  (ECF No. 31-8).  The agreement further stated that the rehabilitated loans would be serviced by AES Loan Servicing.  (*Id.*).  The agreement contained Tucker's mailing address, e-mail address, and a telephone number ending in -9895.  (*Id.*)

PHEAA says Tucker made several payments to rehabilitate her loan (though Plaintiff apparently does not recall making these payments), and on January 5, 2016, PHEAA called Tucker to speak about the completion of the rehabilitation process.  (Krobath Decl. ¶¶ 23-24).  Tucker testified that she took notes from this and a January 12, 2016, call.  (ECF No. 31-10).  Tucker's notes indicate that her payments after rehabilitation would be $278.26 a month and that if she did not receive paperwork (ppw) before March she should call one of two provided numbers.  (*Id.*) Tucker also received a letter dated January 7, 2016, from PHEAA that stated the loans had been removed from rehabilitation and were held with AES.  Tucker's total rehabilitation balance, including collection costs, was now $34,886.68, with an approximate minimum monthly payment of $278.06.  (ECF No. 31-11).  In her Complaint, Tucker avers that in both the January 5 and the January 12 phone calls she told PHEAA's representatives she wanted to receive responses in writing, and that she did not wish to be called.  (Pl.'s Compl. ¶¶ 21-22, ECF No. 1, PageID.3).  PHEAA responds by arguing that despite claiming to keep detailed records, Tucker's handwritten notes say nothing about a request to end phone communication.  PHEAA further says its business

5

records also say nothing about Tucker revoking her consent to receive calls by phone. (Krobath Decl. ¶ 26).[3]

### 4. Post-Rehabilitation: 2016-onwards

Tucker's complaint largely concerns the period after which PHEAA says she had rehabilitated her loan. According to PHEAA, Tucker could not, or would not, pay her minimum payment of approximately $280 a month after the rehabilitation and rather than request assistance, Tucker decided to engage in dilatory and obstructive tactics. PHEAA specifically contends that Tucker, with the assistance of an individual named Terran Bouknight, wrote several letters to PHEAA that requested needless information on her loans. Those letters also disputed whether she in fact owed a debt to the companies or divisions contacting her. Tucker admits she did not make payments on the consolidated loan after rehabilitation, but argues that PHEAA did not answer her questions about her loans or provide the materials she requested, and that she was confused about whether she owed a debt to PHEAA. Moreover, Tucker argues, PHEAA repeatedly violated the TCPA by calling her on her cell phone after she revoked her consent to be called.

*A. The Letter Writing Campaign*

Tucker testified that after receiving the January 7, 2016, letter from PHEAA, she did not begin making payments because the paperwork was confusing. She received communications from both PHEAA and AES and did not know whom to pay. (Tucker Dep. 52, ECF No. 31-2). There was added confusion, she says, because she received a communication that her loan had been sold to a third-party, SunTrust. Tucker says she wrote several letters to AES dated

---

[3] Tucker believes the business records actually help her case. She points to a January 12, 2016 record that states "BORROWER STD WOULD RATHER WIT TO RECEIVE LETTER REGARDING ACCNT BEFORE OPTIONS[.]" (ECF No. 34-4, PageID.330).

February 11, 2016 (ECF No. 31-12), March 7, 2016, (ECF No. 31-13), and March 28, 2016, (ECF No. 31-14) in order to clear up the confusion. PHEAA says AES responded to Tucker's letters on April 18, 2016, with a letter that provided a copy of the promissory note, and which stated Tucker's loans were sold to SunTrust and transferred back to AES for servicing on January 7, 2016. (ECF No. 31-15).

Tucker still made no payments, and on May 17, 2016, PHEAA wrote to Tucker that it had been informed by AES that Tucker was unable to honor her obligation on the loan that was guaranteed by PHEAA under FFELP and informed Tucker about the consequences of default. (ECF No. 31-16). Tucker then wrote several more letters to PHEAA and AES on June 20, 2016 (ECF No. 31-17), August 10, 2016 (ECF No. 31-18), October 20, 2016 (ECF No. 31-19), and on November 28, 2016. (ECF No. 31-20). PHEAA says it, or AES, responded to Tucker in letters dated September 8, 2016 (ECF No. 31-21), November 3, 2016 (ECF No. 31-22), and December 20, 2016 (ECF No. 31-23).

At some point, Tucker complained to the Michigan Department of Insurance and Financial Services. In a response dated September 16, 2016, the department stated that SunTrust informed them that it had purchased Tucker's loan from PHEAA in September 2016. AES was the servicer of the loan. (ECF No. 31-24). The department concluded that this response provided the documentation Tucker requested and concluded its activity on the matter. (*Id.*)

B. *Phone Calls from PHEAA to Tucker*

Tucker complains when PHEAA called her on January 5, 2016, she withdrew her consent to be called via her cell phone. (ECF No. 34, PageID.293). Despite revoking her consent, she contends that between January 6, 2016, and May 25, 2016, PHEAA used its Avaya Proactive Contact 5.1.2 autodialing system to place thirty calls to Tucker's cell phone ending in number

7

- 9895.  (ECF No. 34, PageID.293; Exhibit B (ECF No. 34-2)).  PHEAA's business record for April 19, 2016, reflects that Tucker "INDICATED THT SHE IS KEEPING VERY ACCURATE RECORDS OF ALL CORRESPONDENCE FROM AES INCLUDING RECORDING ALL PHONE CALLS AND WLL NT HESITATE TO REPORT VIOLATIONS TO THE AG, FTC AND BBB.  CHNGED TCPA MOBILE CONSENT TO N."  (ECF No. 34-5, PageID.332).[4]  Despite changing Tucker's consent status, Tucker avers she received ten calls from PHEAA after this date.  (ECF No. 34, PageID.293-294).

PHEAA says that from January until April 15, 2016, PHEAA made 19 calls to Tucker because of her non-payment and in an attempt to assist Tucker from re-entering default.  (Krobath Decl. ¶¶ 23-30).   Then, from May 20, 2016 through July 21, 2016, PHEAA's guarantee division made 7 calls.  (*Id.* at ¶ 31).  And from December 13, 2016, through February 23, 2017, PHEAA made another 3 autodialed calls.  (*Id.* at ¶ 32).  Despite placing these calls, PHEAA says it did not have any phone conversations with Tucker after January 12, 2016.  (*Id.* at 29).  PHEAA avers that the first time it was advised in writing that Tucker did not wish to receive autodialed calls to her cell phone was on October 20, 2016 (ECF No. 31-19) and that it acknowledged the request on November 3, 2016.  (ECF No. 31-22).

---

[4] PHEAA acknowledges a notation was made on Tucker's account on April 19, 2016, that said Tucker did not want to receive autodialer calls to her cell phone.  But it does not appear that PHEAA is admitting that this is the date that Tucker revoked consent.  Rather, the April 19, 2016, notation, it believes, was made in response to Tucker's reference to the FDCPA in one of her communications, but PHEAA says it is not subject to the FDCPA because it was carrying out its fiduciary obligation to collect a debt owed to the United States.  (ECF No. 31, PageID.150 n.5).

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).  Material facts are those necessary to apply the substantive law. *Id.* at 248.  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*  In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist.  Rather, "each movant separately bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F3d 533, 538-39 (5th Cir. 2004).

**DISCUSSION**

Tucker's motion for summary judgment contends that she can make a *prima facie* showing that PHEAA violated the TCPA.  But all the challenged calls occurred after November of 2015.  By that time, Congress had amended the TCPA to exempt calls to collect a U.S.-guaranteed debt.  The dispositive question in this case is whether the exemption applies.  Even under the facts in the light most favorable for Plaintiff, the Court finds the exemption does apply and mandates dismissal.

The TCPA, 47 U.S.C. § 227, provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

…

iii. to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, <u>unless such call is made solely to collect a debt owed to or guaranteed by the United States</u>[.]

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). The latter portion of the TCPA exempting calls made "solely to collect a debt owed to or guaranteed by the United States" was added by Congress as part of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 § 301 (Nov. 2, 2015). Based on this exemption, PHEAA asserts that Tucker's claims fall outside the TCPA because her consolidated FFEL loan is guaranteed by the United States, because the phone calls occurred after the TCPA was amended, and because the calls were to collect a debt guaranteed by the United States.

The Court agrees. The plain language of the statute is unambiguous: calls made solely to collect U.S.-guaranteed debts are exempt from TCPA coverage. In this case, Plaintiff's debts were all guaranteed by the United States. There was no other plausible purpose for the challenged calls but to collect those U.S.-guaranteed debts. All the calls came after the exemption was in effect and so Plaintiff's claims must be dismissed. *See Whalen v. Navient Solutions, LLC*, No. 4:17-cv-56-TWP-DML, 2018 WL 1242020 (S.D. Ind. Mar. 9, 2018) (dismissing a TCPA complaint because of the 2015 Budget Act exemption); *Hassert v. Navient Sols., Inc.*, 232 F. Supp. 3d 1049, 1050 (W.D. Wis. 2017) (same); *Weaver v. Navient Sols., Inc.*, No. 5:16-CV1304, 2017 WL

3456325, at *4 (N.D. Ohio Aug. 11, 2017) (same); *Kesselman v. GC Servs. Ltd. P'ship*, No. 216CV02449SVWRAO, 2016 WL 9185399, at *4 (C.D. Cal. Nov. 17, 2016) (same).

While at first blush that may seem simple enough, Tucker argues that the 2015 amendment is not currently in effect. This is so, she says, because Congress charged the FCC with implementing the 2015 amendments by rule, and an August 2016 FCC rule delayed the 2015 amendments until all of the FCC regulations could be made effective. (ECF No. 40, PageID.398). Tucker's argument begins with additional language in the Budget Act, which provides that "[n]ot later than 9 months after the date of enactment of this Act, the Federal Communications Commission, in consultation with the Department of the Treasury, shall prescribe regulations to implement the amendments made by this section." Pub. L. No. 114-74, 129 Stat. 584 § 301(b). Tucker next argues that, consistent with this directive, the FCC issued a rule on August 11, 2016 that implemented the amendments, but the FCC delayed the effective date of the rule because two portions of the rule required approval from the Office of Management and Budget ("OMB"). *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 2016 WL 4250379, 31 F.C.C. Rcd. 9074 ¶ 60 (2016). Even though the remaining portion of the rule did not require approval from the OMB, the FCC found the two portions requiring OMB approval were "so integral to this regulatory scheme that the remaining rules should not become effective until the consumer-protection rules are in place." (*Id.*) To date, it does not appear that the OMB has issued its approval, and thus the August 2016 regulations do not appear to be in effect.

Tucker argues that the 2015 Budget Act statutory amendment did not and cannot go into effect unless and until the FCC promulgates effective regulations to implement it. To find otherwise, she says, would be to permit a "Wild West" where debt collectors could call a large swath of consumers ad nauseam with no protection to those consumers. (ECF No. 40,

11

PageID.396).[5]  The problem with Plaintiff's position is that Congress in no way made its statutory exemption contingent on later regulations.  To the contrary, it made two direct and independent decisions.  First, it exempted by statutory change calls made solely to collect U.S.-guaranteed debts.  Second, it required an agency to promulgate implementing rules.  Congress did not in any way include language suggesting that an administrative agency could hold the statutory change hostage by failing to honor its own congressionally mandated deadline for promulgating regulations.

It is worth noting that when Congress wanted to postpone the effective dates of its statutory changes in the Budget Act, it knew how to do so.  *See* Pub. L. No. 114-74, 129 Stat. 584 §§ 501, 503 (providing that amendments made the ERISA program applied to plan years beginning December 31, 2016 and December 31, 2015 respectively); *see also id.* at § 602 (providing an effective date of one year after the enactment of the act); *id.* at § 812 (providing an effective date for amendments to the Social Security Act of the earlier of the effective date of regulations issued by the Commissioner or one year after enactment of the act).  Moreover, when Congress directed the FCC to promulgate implementing regulations, it permitted—but did not require—the agency to include in the regulations limits on the number and duration of calls a debt collector could place regarding U.S.-guaranteed debt.  47 U.S.C. § 227(b)(2)(H).  This suggests Congress was perfectly fine without any such limits for U.S.-guaranteed debt.

In examining the issue, the Court is persuaded by a recent district court decision that examined similar arguments.  *Whalen v. Navient Solutions, LLC*, No. 4:17-cv-56-TWP-DML, 2018

---

[5] The Court's lengthy recital of the factual developments in this case from the first inception of debt in 1996 to the present litigation over 20 years later—all without any meaningful payments by Plaintiff—suggest that even after the 2015 statutory amendments, debtors are still considerably more protected than the residents of the old wild west.

WL 1242020 (S.D. Ind. Mar. 9, 2018). That case, as here, involved a defendant loan servicer who argued for dismissal of a TCPA complaint based on the Budget Act exemption. The plaintiff, similarly, argued the exemption was not in effect because of FCC's regulations were not yet effective. The *Whalen* court rejected the plaintiff's argument.

> The amendment became effective on November 2, 2015, when Congress enacted the Budget Act. It is telling that Congress specifically made other sections of the Budget Act effective at later dates while not providing a future effective date to the TCPA amendment. The FCC (and the Department of Education) lacks authority to amend a statute of Congress, and thus, the rules and regulations of the FCC could not change the effective date of the TCPA amendment in the Budget Act. Whalen acknowledges that the amendment permits phone calls to cellular phones to collect debts owed to or guaranteed by the United States, and she only argues the effective date of the amendment. Because the Court determines that the TCPA amendment was in effect at all times relevant to Whalen's claims, the Court concludes that Whalen's claims must be dismissed because Navient's phone calls were exempt from the TCPA's prohibition.

*Whalen*, 2018 WL 1242020, at *4.

The Court agrees with the *Whalen* court that if Congress did not intend for the amendment to be effective on November 2, 2015, it could have and should have said as much, as it did with other sections elsewhere in the Budget Act. Furthermore, the FCC seems to have acknowledged the amendment had immediate effect when it stated in the August 11, 2016 rule that the Budget Act means that the TCPA "*now* explicitly except from the prior express consent requirement certain . . . calls . . . if the calls are 'made solely to collect a debt owed to or guaranteed by the United States.'" *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 2016 WL 4250379, at *2 (emphasis added). Accordingly, the Court finds that the Budget Act's amendments became effective on November 2, 2015.

Finding that the amendment was in effect as of November 2, 2015, the remaining question is whether the exemption applies to the facts of this case. The Court concludes that it does. All parties agree that every challenged call occurred after November 2, 2015. Tucker's sole argument on this point, made for the first time in the supplemental brief, is that there is an issue of material fact whether the calls made to Tucker were made "solely to collect a debt." She points out that that PHEAA admitted two calls were made with the purpose of discussing Tucker's participation in the rehabilitation program. She contends that there is at least a question of fact whether these calls were made solely to collect a debt or were made with the added purpose of informing Tucker about her repayment options. (ECF No. 49, PageID.476-477). Even assuming this argument was properly raised[6] the Court finds no reasonable jury could find PHEAA's calls were made for a purpose other than "to collect a debt owed to or guaranteed by the United States." Tucker's interpretation here is much too narrow. Calls made to inform a borrower of the completion of a rehabilitation program and the new payment amounts on loans that are guaranteed by the United States plainly are made with the purpose of collecting on that debt and hence they fall within the statutory exemption.

For all the above reasons, therefore, the Court concludes that the statutory exemption from the TCPA in the Budget Act was effective on November 2, 2015, and that no reasonable jury could find that the calls PHEAA placed to Tucker fell outside this exemption.

---

[6] *See Woodger v. Taylor Chevrolet, Inc.* No. 14-cv-11810, 2015 WL 5026176, at *6 n.2 (E.D. Mich. Aug. 25, 2015) (noting that arguments raised for the first time in a supplemental brief that go beyond the limits of a supplemental briefing order generally will not be considered).

## CONCLUSION

**ACCORDINGLY, IT IS ORDERED:**

1. Plaintiff Mechelle Tucker's Corrected Motion for Summary Judgment (ECF No. 33) is **DENIED.**

2. Defendant PHEAA's Motion for Summary Judgment (ECF No. 30) is **GRANTED.**

3. This case is **DISMISSED.**

A separate Judgment shall issue.


Dated:     May 10, 2018            /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   CHIEF UNITED STATES DISTRICT JUDGE